IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

United States of America,

      versus

Ernest Vera.

Criminal Action Number
1:25-cr-082-MLB

**Defense Sentencing Memo**

I.    <u>Mr. Vera's Conduct in this Case Was a Complete Aberration</u>

    a. <u>Mr. Vera Will Never Engage in Such Behavior Again</u>

Mr. Vera is 73 years old, and prior to this case, had zero criminal history. (PSR ¶¶ 52-58). His online conduct which led to these charges was the product of a deep depression he had entered as kind of a late-life crisis, when he realized that his dream of having and raising a son of his own was never going to come true. (*See* Mr. Vera's Personal Narrative (Exh. 1[1]) at 5-7).

Mr. Vera let his life fall apart. He didn't take care of his health, couldn't even find the energy to brush his teeth for an extended period of time, and eventually had to have extensive oral surgery to fix the

---

[1] Exhibit 1 – 3 are filed under seal as Doc. 54.

1

resulting issues. (Exh. 1 at 6). He didn't bother filing taxes for several years, accumulating $84,000 in back taxes, penalties, and interest. (*Id.*). And he got fired from his job with the Georgia Department of Transportation, a position in which he had previously excelled, and from which almost no one gets fired. (*Id.*). And, of course, he went down some internet rabbit holes which should have been left unexplored.

Mr. Vera has worked hard to understand where he went wrong, and to equip himself with the insight and tools to make sure he doesn't do so again. Mr. Vera completed a course of 46 counseling sessions with a licensed professional counselor at Broken Chains International, which he started in early 2022, only months after his offense conduct and years before he was indicted or arrested. (*See* Exh. 1 at 7; Exh. 2). While on pretrial release, he has diligently been attending sex-offender treatment at Northern Integrity Counseling Services 2 or 3 times a month, for a total of over 30 sessions. Counselor Tracy Alvord reports that Mr. Vera, "[C]ontinues to be active and compliant in his sessions. He is open to my feedback and guidance." (Letter of Tracy Alvord, MS, LPC, attached as Exh. 3). Mr. Vera has also taken numerous other self-

improvement courses since 2021, and watched hundreds of hours of self-help videos on YouTube. (Exh. 1 at 8).

With this professional help and the support of his family, Mr. Vera has put his depression behind him. He has rehabilitated his relationships with his wife and adopted son. (Exh. 1 at 7). And he has not engaged in any prohibited conduct since the FBI came and talked to him on September 16, 2021, three and a half years before his arrest.

b. <u>Mr. Vera has given a lifetime of public and private service</u>

Mr. Vera voluntarily served in the Army for 21 years, receiving numerous promotions, medals, and commendations. He later worked for many years as an IT project manager for the Georgia Department of Human Services and later the Department of Transportation, with many successes.

Mr. Vera has also given greatly through his church and missionary work. He worked as the church administrator for the Living Word Christian Church. He has gone on more than a dozen missionary trips to Spain, Brazil, Panama, Costa Rica, Cuba, and Honduras. He has been a small-group leader for church-based courses. Mr. Vera and his wife financially support a Christian school in Pakistan, and have

helped families there escape the trap of debt bondage. He's volunteered as a cub scout leader, and a baseball and football coach. For details on all of this and more, please see Mr. Vera's personal narrative, Exhibit 1 especially at pages 3 through 5 and Attachment 1 (letters).

II.    The Nature and Circumstances of the Offense

Compared to many defendants convicted of similar charges, Mr. Vera had a relatively small number of images and videos; 92 images and 15 videos. (PSR ¶ 30). Many defendants are guilty of possession of terabytes of CSAM material composed of hundreds of thousands of images. One detail of his offense, however, seems more aggravating: for a short period of time, he was an administrator and then the owner of the Kik group "Teen Vids n pics," the group where he distributed three pornographic videos of teenage girls which he had retrieved from another group. (PSR ¶¶ 14-15).

But is important to place those facts in the context of how Kik groups work. A previous group owner made Mr. Vera a group admin,

something Mr. Vera had not asked for.[2] And when that owner left the group, the Kik system picked Mr. Vera from among the admins at random and made him the new owner.[3] Mr. Vera left the group himself shortly thereafter, and the total time he was an admin or the owner was two to three weeks.

> III.   The Child Pornography Guidelines Are Unsupported, and Therefore Due Less Consideration

The child pornography guidelines deserve less deference under § 3553(a) because they were not developed empirically, and because they fail to distinguish more culpable defendants from the rest. Because the United States Sentencing Guidelines are now advisory, courts "may vary [from Guidelines] based solely on policy considerations, including disagreements with the Guidelines," especially where in developing the guidelines the United States Sentencing Commission varies from "its

---

[2] *See* https://help.kik.com/hc/en-us/articles/4402344541979-Group-Owners-vs-Group-Admins  ("Group Owners can . . . promote someone to Admin.").

[3] *See* https://help.kik.com/hc/en-us/articles/14090027878555-Delete-your-group  ("Once a Private or Public Group has been created you will not be able to delete it. You do, however, have the option to leave your Group. . . . Once you leave your Group, ownership will be passed on to a Group Admin at random.")

usual empirical approach." *Kimbrough v. United States*, 552 U.S. 85, 101-02 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)).

In *Kimbrough*, the Supreme Court was reviewing the then 100-to-1 disparity in the crack/powder cocaine guidelines, and noted that in formulating the crack guidelines, the Commission did not take account of "empirical data and national experience." 552 U.S. at 109. Thus, "it would not be an abuse of discretion for a district court to conclude . . . that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 110. In *Spears v. United States*, the Supreme Court reaffirmed *Kimbrough* and made clear that even "a categorical disagreement with . . . the Guidelines is not suspect." 555 U.S. 261, 264 (2009).

Numerous courts have expressed the same concern regarding the lack of empiricism behind the development of the child pornography guidelines. "[T]he history of the child pornography Guidelines reveals that, like the crack-cocaine Guidelines at issue in *Kimbrough*, the child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role.'" *United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011)

6

(quoting *Kimbrough*, 552 U.S. at 109); *see also United States v. Grober*, 624 F.3d 592, 600 (3d. Cir. 2010) ("[T]he Commission did not do what 'an exercise of its characteristic institutional role' required—develop §2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (stating child pornography Guidelines are "fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences" because "the Commission did not use this empirical approach in formulating the Guidelines for child pornography").

In *Henderson*, the Court of Appeals took a deep dive through the history of § 2G2.2. *See* 649 F.3d at 960-962. The court documented how Congress repeatedly directed the Commission to include new crimes under § 2G2.2, to increase base offense levels, and to add specific enhancements over the Commission's objections; Congress even directly amended the Guidelines on occasion. By steadily increasing mandatory minimums and statutory maximums, Congress also essentially forced the Commission to further increase base offense levels to keep up. In sum:

7

> Most of the revisions were Congressionally-mandated and not
> the result of an empirical study. As the Commission itself has
> explained, "The frequent mandatory minimum legislation and
> specific directives to the Commission to amend the
> [G]uidelines make it difficult to gauge the effectiveness of any
> particular policy change, or to disentangle the influences of
> the Commission from those of Congress."

*Henderson*, 649 F.3d at 962 (quoting U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 73 (2004)).

Courts have consequently concluded that application of the Guidelines can lead to unreasonable outcomes. "The result is a Guidelines provision where, as the Commission found, if the base offense level was any higher, the typical offender sentenced for receipt of child pornography would face a higher Guidelines range than the typical offender convicted of conspiracy to commit murder and kidnapping." *United States v. Grober*, 624 F.3d at 600.

The guidelines also produce overly harsh recommendations because they have failed to keep up with the changes in consumption, retention, and distribution of child pornography which technology has brought. In *United States v. Cubero*, the Eleventh Circuit discussed a

8

2013 report to Congress released by the Sentencing Commission, which

focused on § 2G2.2 and the need to revise it. 754 F.3d 888, 898-900

(11th Cir. 2014) (citing United States Sentencing Comm'n, *Special

Report to Congress: Federal Child Pornography Offenses* (Dec. 2012), the

recommendations of which have not yet been implemented). "[T]he

Commission concludes that 'the current non-production guideline

warrants revision' because (1) the enhancements do not account for an

offender's use of modern technology and are, thus, 'outdated and

disproportionate'." *Id.* at 898. Specifically:

> A principal premise of criticisms of the current non-production child pornography guidelines is that "dramatic technological changes related to computers and the Internet in the past decade, such as the ascendance of [peer-to-peer] file-sharing programs, ... have changed the way that typical offenders today receive and distribute child pornography" and that the guidelines have failed to adapt to these changes in technology. *See* 2013 report at viii. For example, in this day and age, a majority of child pornography consumers use peer-to-peer software on their computers to collect child pornography files, which allows even novice child pornography consumers to quickly access and store a large volume of child pornography images and videos in a short amount of time. *See id.* at 5–6. This software also allows for instantaneous distribution through the file-sharing aspect of the peer-to-peer software. *See id.* Unlike precomputer-based child pornography consumption, which typically involved time-consuming and costly film-based cameras and photocopiers and distribution in printed form through the

9

postal system, the current computer-based technologies have reduced the barriers to child pornography consumption. *See id.* at 41–42. This technological-shift routinely exposes a large number of child pornography defendants to several guidelines enhancements (e.g., use of a computer (U.S.S.G. § 2G2.2(b)(6))); distribution of child pornography (U.S.S.G. § 2G2.2(b)(3)(F)); and quantity-based enhancements (U.S.S.G. § 2G2.2(b)(7)(D)). The 2013 report suggests that, as a result of technology changes, the § 2G2.2 guidelines treat a majority of offenders similarly without accounting for the variations in the offenders' dangerousness, contact with children, or culpability. *See id.* at xi.

*Id.* at 898 n.9.

As a result, many of the § 2G2.2 enhancements are not genuine aggravating factors, and fail to distinguish more serious violations of the law from less serious violations. "[S]ince the sentencing enhancements apply in almost all cases, the guidelines range is not useful in distinguishing between the most and least culpable child pornography defendants." *United States v. McElheney*, 630 F. Supp. 2d 886 (E.D. Tenn. 2009). "[W]hile drug quantity is often a reliable indicator of intent to distribute drugs, number of images is no such reliable indicator of the culpability of the conduct of a defendant convicted of a child pornography offense." *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106-07 (N.D. Iowa 2009).

The Sentencing Commission statistics bear this out. In FY 2024, 93 percent of the child pornography convictions involved material with prepubescent minors; 48 percent involved some kind of distribution; 51 percent involved material depicting sadistic or masochistic conduct; 97 percent involved the use of a computer; and 75 percent involved possession of more than 600 images.[4] United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics, Guideline Calculation Based, Fiscal Year 2024*, at 98-99.[5]

At the same time, the guideline also fails to include factors which would do a better job of measuring culpability:

> Even as many offenders receive identical, harsh treatment by the Guidelines, the report points out that more accurate indicators of culpability and dangerousness remain

---

[4] In *United States v. Kluge*, the Eleventh Circuit held that courts must now count the number of individual frames contained in CSAM videos. 147 F.4th 1291 (11th Cir. 2025). (See discussion at 15, *infra*). The government had argued that "a one-frame-one-image rule would obviate the purpose of prescribing different levels because the possession of almost any video would vault the offender to the top of the range." *Id.* at 1299-1300 (internal quotes omitted). Going forward, the enhancement for number of images will be even more meaningless to distinguish cases.

[5] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2024/Ch2_Guideline_FY24.pdf. The 2025 report is not yet available.

unaccounted for. The Commission presents three aspects of offender behavior that would be more accurate indicators of culpability: (1) better analysis of pornography collecting behavior; (2) engagement in child-pornography communities; and (3) history of criminal sexually dangerous behavior.

*United States v. Klear*, 3 F. Supp. 3d 1298, 1304 (M.D. Ala. 2014)

(reviewing the Commission's 2013 report).

First, as to the content of the collection and collecting behavior:

The Commission notes that an updated analysis of the size and content of child-pornography collections would better distinguish among offenders. The current Guideline does take into account the size of collections, violent images, and age of children. However, because of low thresholds for applying enhancements related to the nature of child-pornography collections, the current approach does not help the court to differentiate between more and less egregious collections. The Commission also recommends that courts look to the collecting behavior, such as "the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; and the number of unique, as opposed to duplicate, images possessed by an offender." Sentencing Commission Report at 323. The Commission notes that deliberate and meticulously organized child-pornography collections are often an indicator of long-time, dedicated collectors who may be particularly voracious consumers of child pornography.

*United States v. Klear*, 3 F. Supp. 3d 1298, 1304 (M.D. Ala. 2014). Here,

Mr. Vera possessed 92 images and 15 videos, a modest collection by

12

today's standards. There is no evidence that he catalogued or organized these files.

Second, the nature of engagement with other offenders is an important factor which the current § 2G2.2 fails to capture:

> The Commission also discusses the changed nature of child-pornography distribution, presenting three general categories of distribution: impersonal distribution, personal distribution, and online child-pornography communities. Impersonal distribution occurs through so-called "open" peer-to-peer networks, in which any user can access any other user's files and no communication occurs among users. LimeWire is an example of an "open" peer-to-peer network. *See id.* at 52. Personal distribution occurs over email or through "closed" peer-to-peer programs, which are sometimes called "friend-to-friend" programs. In a "closed" peer-to-peer program, such as Gigatribe, users can chat with each other, affirmatively deciding whether to share images or seeking out particular kinds of images. *See id.* at 53. Finally, the Commission notes the development of online communities of child-pornography users. These communities promote discussion of sexual interest in children, offer means to share child pornography, and can often normalize sexual interest in children in offenders' minds, so that actual sexual contact with a child no longer seems as wrong. *See id.* at 92–99. Most disturbingly, members of child-pornography communities often encourage each other to create new child pornography—which may lead a mere possessor to take the step to production. *Id.* at 96.

*Klear*, 3 F. Supp. 3d at 1304. Here, other than distributing three videos, there is no evidence that Mr. Vera engaged with other offenders in any

kind of community, or either received or gave encouragement to actually create child pornography.

Third, the current guidelines undercount previous criminal sexually dangerous behavior:

> Finally, the Commission notes that the Guidelines inadequately account for previous criminal sexually dangerous behavior. Existing statutory and Guidelines provisions, including the Criminal History rules, fail to take into account all forms of previous sexually dangerous behavior. *Id.* at 324. Therefore, the Commission urges a more serious determination of offenders' prior behavior, in part because those offenders with a long history of dangerous behavior are more likely to have the antisocial personality traits that correspond with sexual contact with children.

*Klear*, 3 F. Supp. 3d at 1304. Again, Mr. Vera has no history of criminal sexually dangerous behavior.

To come to an appropriate sentence under § 3553(a), the Court should start by considering what the guidelines would be without this raft of non-distinguishing, broadly present enhancements. The bumps for prepubescent minors, distribution, sadistic or masochistic conduct, use of a computer, and number of images add a total of an astounding 18 levels. Without these, Mr. Vera's properly calculated adjusted guidelines range would be just 30 to 37 months.

14

But even that base offense level of 22 has been artificially inflated by Congress. After simple possession of child pornography was first criminalized in 1990, § 2G2.4 was added to the guidelines to cover the new crime, and the base offense level was 10. *Henderson*, 649 F.3d at 960. At that time, the base offense level for trafficking of child pornography under § 2G2.2 was 13. *Id.* After repeated Congressional directives, the base level for possession is now 18, and for receipt or distribution, 22. If Mr. Vera had a base offense level of 13, his guidelines range would be only 6 to 12 months.

IV.   The PSR Misapplies the Enhancements for Number of Images and Pattern

A. The number of images for the videos is unsupported

To calculate the offense level, the Court must determine the number of CSAM images which Mr. Vera possessed or distributed. U.S.S.C. § 2G2.2(b)(7). According to the PSR, Mr. Vera possessed or distributed 92 still images, and 15 videos.[6] The guidelines commentary

---

[6] The defense objected to the draft PSR in part because it included in this count images characterized as "suspected" CSAM. Based on the clarification in the amended final PSR, Mr. Vera withdraws that part of his objection.

directs that each video shall be considered to have 75 images. U.S.S.C. § 2G2.2 cmt. n. 6(B)(ii). In *Kluge, supra*, however, the Eleventh Circuit held that the commentary was not controlling, and that each video should count for as many images as it contains actual frames. 147 F.4th at 1301. (The court found that § 2G2.2(b)(7) is not "genuinely ambiguous," and thus that no deference is owed to the Sentencing Commission's interpretation of it in commentary, per *Kisor v. Wilke*, 588 U.S. 558 (2019).)

Only video frames containing CSAM images should count as CSAM images, however. Neither *Kluge* nor any other case holds that every frame of a video should count as a CSAM image just because the video, somewhere, contains at least one CSAM frame. The PSR, however, simply multiplies the frame rate by the number of seconds for each video clip, without evidence of how many frames actually contain CSAM images. (PSR ¶ 29).[7] Any fact the Court relies on at sentencing must be proven by a preponderance of the evidence. *United States v. Rodriguez*, 732 F.3d 1299, 1305 (2013).

---

[7] The defense made this objection to the draft PSR. The amended final PSR does not address it.

B. <u>The enhancement for engaging in a pattern of sexual abuse does not apply</u>

The PSR incorrectly applies a 5-level enhancement pursuant to § 2G2.2(b)(5) for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor. (PSR ¶ 40). The PSR cites as evidence the fact that Mr. Vera stated that he had sexual contact with a female he believed to be 16 years old. Those were consensual encounters, and 16 is the age of consent in Georgia. This conduct therefore does not qualify as "sexual abuse or exploitation," which is defined as:

> (A) conduct described in 18 U.S.C. § 2241, § 2242, § 2243, § 2251(a)–(c), § 2251(d)(1)(B), § 2251A, § 2260(b), § 2421, § 2422, or § 2423; (B) an offense under state law, that would have been an offense under any such section if the offense had occurred within the special maritime or territorial jurisdiction of the United States; or (C) an attempt or conspiracy to commit any of the offenses under subdivisions (A) or (B). "Sexual abuse or exploitation" does not include possession, accessing with intent to view, receipt, or trafficking in material relating to the sexual abuse or exploitation of a minor.

U.S.S.C. § 2G2.2 cmt. n. 1.

> In response to this objection, the amended final PSR states:

> Pursuant to USSG §2G2.2, comment. (n.1), a "minor" means (A) an individual who had not attained the age of 18 years. The defendant admitted he had three separate sexual encounters with a minor believed to be 16 years of age,

17

possibly 15 years of age. The defendant met the minor female on Kik and communicated with her for two to three months prior to their first sexual encounter.

(PSR ¶ 40). This is correct, but irrelevant. Mr. Vera is not objecting because the person he had sexual encounters with was not a minor; he told the agents she was. But because she was the age of consent and the encounters were consensual, it does not qualify as "sexual abuse or exploitation." The PSR asserts that Mr. Vera's conduct constitutes a violation of 18 U.S.C. § 2422(b), but does not explain how.

The PSR also alleges that Mr. Vera sexually exploited "indianprincess 143143," referencing Paragraphs 20 – 22. This was an account which Mr. Vera chatted with online. While he apparently believed he was chatting with a real person who was a minor, there is no corroboration of that. It could have been a scammer, a bot, or just someone who likes role-playing on the internet. More importantly, "'Sexual abuse or exploitation' does not include possession, accessing with intent to view, receipt, or trafficking in material relating to the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2 n. 1. Nor does asking for pictures qualify as "conduct described in 18 U.S.C. § 2241, § 2242, § 2243, § 2251(a)–(c), § 2251(d)(1)(B), § 2251A, § 2260(b), § 2421, §

2422, or § 2423". *Id.* Again, the PSR asserts that Mr. Vera's conduct constitutes a violation of 18 U.S.C. § 2422(b), but does not explain how.

## V.    A Reasonable Sentence

Mr. Vera's conviction for distribution of child pornography means that the Court must sentence him to at least 60 months in custody. Because his conduct was so aberrational, because he has already done so much work to accept responsibility and rehabilitate himself, because of his lifetime of public and private service, and because the overinflated guidelines are empirically unsupported and fail to meaningfully distinguish more from less culpable defendants, Mr. Vera joins the government in asking the Court to sentence him to 60 months. Given the nature and circumstances of the offense, and his history and characteristics, such a sentence fulfills all the purposes of sentencing.

Dated:  This 17th day of June, 2026.

Respectfully submitted,

Colin Garrett
State Bar No: 141751
Attorney for Ernest Vera

Federal Defender Program, Inc.
Suite 1500, Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
(404) 688-7530
Colin_Garrett@fd.org